IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHEN J. TROST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17 C 4415 |
| ) | |
| UPS GROUND FREIGHT, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Stephen Trost has sued his former employer, UPS Ground Freight, Inc. (UPSF), alleging that he was subjected to race discrimination during his employment with UPSF in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-2. UPSF has moved for summary judgment. For the reasons stated below, the Court denies UPSF's motion.

**Facts**

Trost is a Caucasian male. He was employed at UPS starting in 1982 or 1983 and then at UPSF, a division of UPS, from April 2011 until he retired on February 29, 2016. Trost was first hired at UPSF as a part-time loader and unloader and was last employed as a terminal manager at UPSF's Bedford Park terminal facility from January 2014 until his retirement on February 29, 2016. Trost's responsibilities as terminal manager included managing a staff of approximately 175 employees, among other duties. He reported to Robert Goble, who served as regional director of operations, and

Goble reported to Kevin Hartman, regional vice president.

Trost alleges that UPSF wrongly denied him a bonus for the year 2015 due to his race, stemming from his termination of an African-American employee named Travis Jones in December 2015. Trost fired Jones, who worked at the Bedford Park terminal, for attendance-related issues. Trost says that he had received the bonus in previous years and that he was performing his job satisfactorily.

The events involving Trost and Jones took place starting on September 29, 2014. Jones was a forklift driver at the loading dock. He wanted to leave work, saying he was feeling tired, but management refused to let him leave. Jones continued to insist, and Trost was called in to address the issue. Trost told Jones that if he was physically unable to do his job, he couldn't go home—rather, he had to go to the doctor. Jones refused to go to the doctor, and according to Trost, Jones swore at him, threatened to kill him, and chest-bumped him while leaving the facility. Trost called the police to report that Jones had assaulted him, and Jones was arrested near the terminal. Later that day, Trost filed a police report alleging that Jones had assaulted him. Trost called Goble to report the incident, and Goble approved Trost's request to terminate Jones. Goble informed Hartman of the termination decision, and Hartman also approved.

The criminal charge against Jones went to trial, at which Trost testified for the prosecution. Jones was found not guilty. He then filed a grievance through his labor union challenging his termination, and in May 2015, he was returned to work at UPSF. After Jones's return, he filed a lawsuit against UPSF alleging claims of false imprisonment and malicious prosecution based on Trost's actions. Trost became aware of the lawsuit by September 2015.

In May or June 2015, after Jones's return to UPSF, he failed to follow a work directive, and management decided to terminate him again. Trost was not involved in this termination. Jones filed a grievance and prevailed again. During the grievance process, Jones stated that he had medical issues for which he was taking medication. Once he submitted information regarding the medication, he was cleared to return to work. Before Jones returned to work, UPSF contends, Trost was involved in a phone call that included Goble, Hartman, and labor management and human resources representatives. According to UPSF, Trost was told that he was expected, in dealing with Jones, to be professional, follow UPSF anti-harassment policy, and not retaliate against him. Trost denies that this took place. It is undisputed, however, that when Jones returned to UPSF, Trost knew he had a medical condition and was on medication.

After Jones's second return to UPSF, he had attendance issues and was regularly absent from work starting on October 28, 2015. On November 4, Jones's uncle Quincy Jones, also an employee at the Bedford Park terminal, informed UPSF management that Jones's family did not know where he was. The next day, November 5, Jones did not come to work. UPSF staff issued Jones a 72-hour letter per Trost's request, directing Jones to "submit official verifiable documentation to support your past and ongoing leave of absence . . . within seventy-two (72) hours." *See* Def.'s Stat. of Material Facts ¶ 29. The form Trost used to submit the 72-hour letter stated at the bottom, "All discharges need to be approved by the RDO, Labor Dept. and the RVP." *Id.* ¶ 30. The acronyms RDO and RVP appear to refer, respectively, to Goble, the Regional Director of Operations, and Hartman, the Regional Vice President. On

3

November 6, Jones was absent from work again, but his uncle reported that he had been hospitalized for medical reasons. Trost did not know whether this was true, as Jones never provided any documentation to support his medical leave as required by UPSF rules.

On November 10, Jones spoke to Dan Hart, assistant manager at the Bedford Park terminal. Jones told Hart that he had a medical condition for which he was under a doctor's care, he had received the 72-hour letter, and he wanted to know what he needed to do to return to work. However, when Jones was absent from work again on November 11 and 12, Trost directed the sending of a second 72-hour letter to Jones. On November 18, Jones came to the Bedford Park terminal to inform Trost that he was still under a doctor's care for his medical condition and that he would be returning to work on November 23. However, Jones was absent the next several work days, and on November 30, Trost directed sending a third 72-hour letter to Jones.

Jones remained absent from work through December 9. Trost was on vacation at the time and called UPSF to direct staff members to terminate Jones on December 9, effective immediately. He did not seek or receive approval from Goble, Hartman, or the Labor Relations Department. On December 10, Jones texted his supervisor that his doctor hadn't cleared him to return to work and that he wanted to know whether there was any paperwork UPSF needed him to give to his doctor at an upcoming appointment. Jones's malicious prosecution lawsuit against UPSF was still pending at the time Trost fired Jones.

On December 11, Goble found out through human resources manager Marquita Barnes that Jones had been terminated. Barnes had learned of the termination while

she was gathering documentation for Jones's lawsuit against UPSF. Goble was upset because he hadn't been informed or consulted before the termination. Goble has testified he had previously told the managers who directly reported to him, including Trost, to inform him before firing any employees. Hartman and Barnes have also testified that Trost was required to seek approval from Hartman and Labor Relations. But Trost has testified that prior to Jones's termination, he had not sought approval from upper management before terminating hourly employees and had not been told that he had to. Trost states that it was not until he terminated Jones on December 9, 2015 that Goble told him that he had to contact Goble before terminating an employee.

Goble asked Barnes to investigate Trost's actions leading up to the termination. Barnes and her supervisor, Rick Picardi, put together a report regarding the termination. Barnes called Trost and asked who gave him authority to terminate Jones and why he had not directed Jones to call the Human Resources Service Center (HRSC), the UPSF department responsible for assisting employees in opening claims for disability, workers' compensation, and medical leave. UPSF's Injured Employee Process instructs managers to direct ill or injured employees to seek help from the HRSC. Trost states, however, that prior to Jones's last termination, he (Trost) did not receive training or documentation regarding UPSF policies on directing employees to HRSC or handling employees with medical situations. At his meeting with Barnes, Trost told Barnes that as a terminal manager, he understood he had the authority to terminate employees for attendance-related issues. Barnes discussed her investigative findings with Hartman and Goble.

On December 18, Barnes met with Trost and Picardi to review the investigation.

Trost testified that during this meeting, Barnes referred to the fact that Jones is African-American and Trost is white, and as a result, it "was a problem" that Trost terminated Jones. Pl.'s Stat. of Add'l Facts ¶ 22. Trost says that Picardi did not verbalize any objection to Barnes's comment.

UPSF's International Management Incentive Program (IMIP) award is an annual bonus available to full-time managers based on the company's performance and the performance of the individual manager. The bonus is granted each year by recommendation, with a variety of factors considered in deciding whether to recommend a manager for the bonus, including compliance with UPSF policies and overall job performance. A manager's eligibility for the IMIP bonus does not ensure that it will be granted. However, the "objectives of IMIP are to align pay with annual performance." *Id.* ¶ 40. UPSF has an extensive administrative guidebook detailing specific IMIP award policies such as the criteria required for receiving the award, the schedule for distribution, and the procedures for how managers must document their recommendations of employees. The Regional Director of Operations makes the decision to recommend a terminal manager for the IMIP bonus; in this case, Goble was responsible for deciding whether to recommend Trost.

Goble has testified that did not recommend Trost for the IMIP bonus for 2015 because he believed Trost violated UPSF policy by terminating Jones without notice to or approval from Goble. Goble testified that Trost's work performance was acceptable and had it not been for the way Trost terminated Jones, he would have recommended Trost for the IMIP bonus. Hartman has testified that he approved Goble's decision not to recommend Trost for the bonus because he also believed Trost acted improperly by

terminating Jones without approval from Goble or the Labor Relations Department. Goble has testified, however, that Trost only needed to get prior authorization from him, not anyone else. The decision not to recommend Trost for the IMIP bonus was sent to UPSF's internal legal department, which prepared documentation to inform Trost of the decision.

January 8, 2016 was Trost's last day of work before his retirement. On that date, Goble and Barnes met with Trost to read him a letter informing him that he would not be receiving the IMIP bonus for 2015. The letter stated that UPSF had conducted an investigation relating to allegations of inappropriate behavior by Trost and had found that he had violated company policy and that as a result, he would not receive the IMIP bonus for 2015. Trost says that during this meeting, Barnes again indicated that one reason for not receiving the bonus was directly related to the fact that he is white and terminated an African-American employee, and "that was a problem." *Id.* ¶ 24. According to Trost, Goble did not say anything after hearing Barnes's comment. Trost had previously received an IMIP bonus for each year he had been a supervisor or manager at UPSF.

In April 2016, Trost called Goble to ask again why he did not receive the IMIP award. Goble told Trost to call Picardi and asked if Trost recalled the meeting that he, Barnes, and Trost had on Trost's last day of work. Trost responded in the affirmative, and Goble replied, "Well, then, you know what happened." *Id.* ¶ 25.

Prior to terminating Jones, Trost had personally terminated about a dozen employees and participated in approximately 20-25 additional terminations. Trost has testified that only some of these terminations had been discussed with other

7

management before they took effect, and he was never disciplined for any of these previous terminations.

Trost originally asserted claims of race discrimination and retaliation, but he subsequently withdrew his retaliation claim. Thus the only remaining claim involves Trost's contention was subjected to race discrimination when he was denied the IMIP bonus for 2015. UPSF has moved for summary judgment, arguing that denial of a discretionary bonus does not constitute an actionable adverse employment action and that Trost has not offered evidence from which a reasonable jury could find that he was denied the bonus due to his race.

**Discussion**

Summary judgment is proper where there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws reasonable inferences in that party's favor. Summary judgment must be denied if there is enough evidence for a reasonable jury to find in favor of the non-moving party. *See, e.g., Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017).

A plaintiff asserting a claim of race discrimination may submit either direct or circumstantial proof of discriminatory intent or by relying on "indirect" proof via the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Alternatively, the plaintiff can rely on an evaluation of the evidence as a whole, as described in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). *See Carson*, 865 F.3d at 532–33. Trost does not argue the case under the *McDonnell*

*Douglas* burden-shifting framework, so the Court will bypass that analysis.

Under any method of analysis, Trost must establish that he suffered an adverse employment action that is actionable. An actionable adverse employment action is a quantitative or qualitative change in the terms or conditions of employment. *See, e.g., Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002). In this case, Trost cites the denial of an IMIP bonus for 2015. UPSF argues that the loss of a bonus is not an adverse employment action if the bonus is discretionary, relying on *Nasserizafar v. Indiana Department of Transportation*, 546 F. App'x 572, 575 (7th Cir. 2013); *Palermo v. Clinton*, 437 F. App'x 508, 511 (7th Cir. 2011); and *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008). A reasonable jury could find, however, that the IMIP bonus is not completely discretionary—i.e., it is not "sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer." *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000). The evidence reflects that IMIP bonuses are given annually and are based on specific, well-defined criteria. In *Hunt*, the court differentiated between a raise and a discretionary bonus when holding that denials of raises could be adverse employment actions because raises were "the norm for workers who perform satisfactorily." *Hunt*, 219 F.3d at 654. Trost had received the IMIP bonus every year he had been a supervisor or manager up until 2015. A reasonable fact finder could determine that it was not entirely discretionary and thus that the denial of the bonus based on Trost's race amounts to actionable discrimination.[1]

---

[11] One also wonders how far the "discretionary bonus" rule goes. Can it be contended seriously, for example, that an employer who *overtly* awarded bonuses based on race (or national origin, gender, disability, or religion) would escape liability? *See, e.g., Davis v. N.Y. City Dep't of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (concluding that an

9

In support of his contention that he was denied the IMIP award based on his race, Trost cites Barnes's race-related comments made during her investigational meeting with him and again during the disciplinary meeting. On each of those occasions, Trost has testified, Barnes said that it "was a problem" that Trost, a white person, terminated Jones, an African-American person. Trost has also testified that neither Picard, who was present at the first meeting, nor Goble, who was present at the second, indicated any disagreement with Barnes's assessment. Though UPSF denies that any such statements were made, the Court cannot appropriately resolve testimonial conflicts in ruling on a motion for summary judgment; rather, the Court must view the evidence in the light most favorable to Trost, the non-moving party. Were a jury to believe Trost's account, as it would be entitled to do, it could reasonably conclude that he was denied the IMIP award due to his race.

Even though Barnes was not a decisionmaker regarding Trost's IMIP award, if one views the evidence in the favorable to Trost, Goble's and Picardi's lack of objection to Barnes's alleged comments—which directly cited Trost's race—can be argued to amount to adoptive admissions by management personnel who *were* decisionmakers. In addition, Trost has testified that when he spoke with Goble after his retirement to ask about the denial of the bonus, Goble referred to the disciplinary meeting with Barnes and commented, "Well, then, you know what happened." This likewise could reasonably be understood as agreement with Barnes's alleged statement at that meeting.

---

employer's discretion to withhold or reduce a bonus does not entitle the employer "to allocate the bonus on the basis of prohibited discrimination.").

UPSF's argument that Trost has to meet an additional burden of showing "background circumstances" showing a reason to discriminate against white persons is a *McDonnell Douglas*-oriented requirement. It does not apply when (as here) there is direct evidence of a race-based reason for the employer's action or, for that matter, under the *Ortiz* approach.

Also supporting Trost's claim is the evidence he has cited that would permit a reasonable jury to find that he did not actually violate UPSF policy when he terminated Jones without prior approval from upper management. Despite the statement on the 72-hour letter form appearing to require such approval and the other evidence cited by UPSF, Trost has offered evidence from which a reasonable jury could find that it did not work that way in practice. Were a jury to find that UPSF denied Trost the IMIP bonus based on a non-existent policy or one that existed in name only—as a reasonable jury would be entitled to do—it could conclude that this is circumstantial evidence that, together with the direct evidence, supports a finding of intentional discrimination.

## Conclusion

For the reasons stated above, the Court denies UPSF's motion for summary judgment [dkt. no. 23]. The case is set for a status hearing on September 4, 2018 at 9:30 a.m. to set a trial date and discuss the possibility of settlement.

Date: August 27, 2018

                                                                                            _____
                                                                                            MATTHEW F. KENNELLY
                                                                                            United States District Judge

11